## PEOPLE *v.* ARNETT.

1. WITNESSES—STATEMENT INADMISSIBLE MAY BE RENDERED ADMISSIBLE BY WAIVER.

In a prosecution for murder, testimony as to a statement made by the victim after the shooting not in the presence of the accused, and not admissible as part of the *res gestæ* or as a dying declaration, was inadmissible unless the right to object thereto was waived by accused.

2. HOMICIDE—EVIDENCE—WHERE PART OF CONVERSATION INQUIRED INTO OTHER PARTY ENTITLED TO BRING OUT THE REST.

Where, in a prosecution for murder, the defense brought out part of a conversation between witness and the victim, after the shooting, not in the presence of the accused, there was no error in admitting the rest of it so far as it was germane to the issues, and bore directly on that part inquired into, although it was not admissible as substantive evidence unless it was within the rule of dying declarations.

3. SAME — DYING DECLARATIONS — NOT ERROR TO ADMIT DYING DECLARATION ALTHOUGH NOT SO DENOMINATED.

Where, in a prosecution for murder, a statement of the victim as to some of the details of the shooting was admissible in evidence as a dying declaration, the Supreme Court may not reverse the case because it was not so denominated when it was admitted on the trial.

4. SAME—DYING DECLARATIONS MUST BE SANCTIONED BY BELIEF THAT DEATH IS IMMINENT.

Dying declarations, to be admissible as such, must be sanctioned by belief on the part of the declarant that he is about to die; otherwise they are but hearsay.

5. SAME—NOT NECESSARY THAT DECLARANT STATE HE IS AWARE OF IMPENDING DEATH WHERE IT IS A FACT HE MUST HAVE SENSED.

Where the victim was shot through the intestines, and

¹Criminal Law, 16 C. J. §§ 1269, 1270; ²Id., 16 C. J. § 1111; ³Id., 17 C. J. § 3544; ⁴Homicide, 30 C. J. § 498; ⁵Id., 30 C. J. §§ 504, 505; 56 L. R. A. 282; 1 R. C. L. 538; 1 R. C. L. Supp. 190; 4 R. C. L. Supp. 40.

he must have sensed that death was impending, as it occurred within 48 hours, a statement by him, made after the shooting, giving some of the details thereof, was admissible in evidence as a dying declaration, in a prosecution therefor, although he was not asked, and did not state, that, at the time he made the statement, he was aware of impending death.

6. SAME—EVIDENCE—RESISTING OFFICER.

In a prosecution for murder, evidence that defendant took hold of the victim, who was an officer in the act of arresting defendant's brother, and that if he had not interfered the officer would have obtained possession of the gun before he was shot, *held*, sufficient to take to the jury the charge against defendant.

7. SAME—RESISTING OFFICER—MOOT QUESTION.

Where, in a prosecution for the murder of an officer of the law, defendant claimed that he interfered with the officer, who was arresting his brother, after the first shot was fired, because he believed his brother's life was in peril from the shooting, but the jury, by its verdict of guilty, determined that defendant seized the officer before the first shot was fired, the question as to whether he had any right to so interfere is moot; not being applicable to the defense offered or to the case of the prosecution.

8. SAME—TRIAL—INSTRUCTIONS.

In a prosecution for the murder of an officer while resisting arrest, an instruction that there was no question but that the fatal wound was inflicted by a revolver in the hands of defendant when the officer was attempting to remove defendant, after arresting him, from an automobile, *held*, justified by defendant's own testimony.

9. SAME—RELATIONSHIP NO JUSTIFICATION FOR INTERFERING WITH OFFICER MAKING ARREST.

Where an officer was arresting an intoxicated man, who had a gun in his hands, and while attempting to get possession of the gun and remove him from an automobile, a brother of the arrested man seized the officer and prevented him from obtaining possession of the gun, with which he was shot an instant later, the brother was a volunteer aid in an obstruction to a lawful arrest, and

⁶Homicide, 30 C. J. §§ 549, 570; ⁷Criminal Law, 17 C. J. § 3543; ⁸Id., 16 C. J. § 2320; ⁹Obstructing Justice, 29 Cyc. p. 1331.

blood relationship, without reasonable apprehension of bodily harm to his brother, was neither an excuse nor a justification.

10. ARREST — INTOXICATION IN PUBLIC PLACE JUSTIFIES ARREST WITHOUT WARRANT.

It is the duty of the sheriff to arrest, without a warrant, one who is intoxicated in a public place.

11. HOMICIDE — FELONY TO RESIST OFFICER — MURDER IF OFFICER KILLED BY ONE RESISTING ARREST.

Under 3 Comp. Laws 1915, § 14994, one who resists arrest while intoxicated in a public place commits a felony, and if he kills an officer either intentionally or even by mischance, he commits murder.

12. SAME—RESISTING ARREST—MURDER IN SECOND DEGREE.

Where an officer was shot and killed by a gun in the hands of a man who was resisting arrest, the jury were justified in convicting him of murder in the second degree.

Error to Montcalm; Hawley (Royal A.), J.   Submitted April 15, 1927.   (Docket No. 153.)   Decided June 6, 1927.

Edgar Arnett and David Arnett were respectively convicted of murder in the second degree and manslaughter, and sentenced to imprisonment for life in the State prison at Marquette and for not less than 7 nor more than 15 years in the State prison at Jackson.   Affirmed.

*Penny & Worcester*, for appellants.

*William W. Potter*, Attorney General, *D. Hale Brake*, Prosecuting Attorney, and *Frank A. Miller*, Assistant Prosecuting Attorney, for the people.

WIEST, J.   Edgar Arnett was convicted of murder in the second degree, and David Arnett of manslaughter, under an information charging them jointly

---

[10]Arrest, 5 C. J. § 31; [11]Homicide, 29 C. J. § 70; Obstructing Justice, 29 Cyc. p. 1331; [12]Homicide, 30 C. J. § 560.

with the murder of Franklin B. Henkel, sheriff of Montcalm county. Defendants prosecute review by writ of error. September 22, 1926, defendants attended a homecoming at the village of Lakeview, Montcalm county. Edgar, at the home of his brothers, David and Kelson, saw a revolver and placed it in his pocket without their knowledge. At the village Edgar purchased cartridges, loaded the gun, placed it in his pocket and later showed it to an acquaintance. During the day both defendants became the worse for liquor and, about 11 o'clock at night, the sheriff, noticing their intoxication, told them to go home and followed them to their automobile. Edgar seated himself in the car to drive and was told by the sheriff to "get over and let your brother drive." Edgar replied that he could drive the car, and remarked "who in hell are you?" The sheriff then said "You are too drunk to drive it. You come with me; I will lock you up," and entered the car. As the sheriff entered the car Edgar drew the loaded gun from his pocket, the sheriff took hold of the gun but did not obtain possession, and, in the hands of Edgar, a bullet was fired from the gun through the body of the sheriff, penetrating the walls of the body, the peritoneum, mesentery and cutting an intestine, causing death 48 hours later. When the sheriff entered the car, David was standing on the ground, heard the sheriff say to Edgar, "You will have to come with me; I will lock you up;" knew Mr. Henkel was an officer and was arresting Edgar for being drunk.

The prosecution claimed at the trial that, as the sheriff entered the car, and was trying to take the gun from Edgar, David seized hold of the sheriff, interfered with his hold on the gun and then the first shot was fired. The jury so found.

Defendants' versions will be stated later. When David took hold of the sheriff he brought the officer

from the car, and, while the sheriff was taking measures against David, Edgar got out of the car with the gun in his hand and shot the sheriff again. The second shot did not inflict a mortal wound.   To understand the issues of fact and applicable law, we now quote, from their testimony, the versions of defendants.

David Arnett testified:

"Edgar then got into the car first.   He got in under the wheel and the sheriff told him to get over; he was too drunk to drive.   Edgar did get over.   When he did get over he made the remark he claims he did, but he got over at the same time.   I remember that the sheriff said I will take you and lock you up, or something of that sort.   Edgar spoke up and says, 'Who in hell are you,' when he told him to get over. The next thing I saw the sheriff started to get into the car.   He says, 'You will have to come with me,' and got into the car and right off I heard the report from the gun, right off immediately as the sheriff got into the car.   I thought the sheriff was shooting my brother and started to get into the car to see what was the trouble.   Up to that time I did not know that Edgar had any gun.   I didn't see any gun on him then.   When I went to get into the car I don't know whether or not I took hold of the sheriff.   I don't remember whether I did or not.   After this report I heard trouble and he came out of the car it seems he turned around as he came out of the car and he grabbed on to me and commenced pounding me over the head with something, I couldn't say what it was, kind of stunned me.   I hollered out I was shot, seemed as if I was shot and I made this remark: 'I am shot, I am shot.'   After I remarked, I am shot, I heard another shot shortly afterwards, immediately afterwards.   After the sheriff got out of the car I heard two shots I think as I remember.   After these last two shots were fired, about that time I got relieved from the sheriff and started away immediately in a hurry.   *   *   *   I then started to get into the car because I heard a report from the gun shortly after he got into the car and I thought he was shooting my brother. so I started to get in the car with Henkel.

I didn't jump on him and put my arms around his neck as I recall. I don't remember whether I did or not, I won't say I didn't. I didn't pull Henkel out of the car to my knowledge; I don't want to say either way; to my knowledge I didn't. I don't know. I knew what was going on then. I knew Henkel was an officer and I knew he had already arrested Edgar and had taken him into his custody before I got into the car; in fact, I didn't get into the car at all. I started to get in the car; when I started to get in the car Henkel came out of the car. I didn't pull him out; to the best of my opinion I didn't. * * *

"Q. What did you step up on the car for?

"A. I thought he had shot my brother. I wanted to protect my brother.

"Q. You were going to protect your brother when he was under arrest?

"A. I don't know. I stepped up on the car platform to protect my brother. I thought he was shot. I wanted to see if he was." * * *

Edgar Arnett testified:

"I got into the car under the steering wheel on the left side. The sheriff told me to get over and let my brother drive the car. I got over to the other side but I told him I was able to drive the car. He said, 'You are too drunk to drive.' I says, 'Who in hell are you.' He says, 'I will take you and lock you up.' I had the gun in my pocket at that time. I took it out to put it in the back seat and he came in the car and grabbed the gun and it went off. He pulled the gun and it went off. I did not take it out of my pocket for the purpose of shooting at the sheriff nor for the purpose of frightening him or anything of the kind. I took it out to put it over in the back seat. The sheriff at that time was getting into the car. He grabbed hold of the gun and it went off. I had hold of it at the same time. I don't know when I took it out whether I had my finger on the trigger or not, it was done so quick I don't remember. I didn't have it nor intend to have it with my finger on it. When this gun went off, we went out of the car on the ground. He was in front of me. He backed out of the car, I don't know how he went out. We went

out together in some way in the mixup.   I don't know whether the sheriff grabbed hold of me or not, but I finally got out of the car.   I do not know whether David grabbed hold of the sheriff or not; he was behind him trying to get in the car, I imagine he was trying to get into the car.   He was behind the sheriff.   This was a two-door Ford.   As to whether I got out of the car after the sheriff went out, I was right there in the mixup when I went out, I don't know how I went out.   When I got out of the car, the sheriff was beating David over the head with a gun and pushing David out in the front of the car. David was backing up, trying to get away from him, trying to dodge the licks.   David began crying.   I heard David cry and he says, 'I am shot, I am shot.' Then I was excited, I thought he was killing David so I fired the second shot.   The first shot went off in the car, the second one I fired.   At that time, I didn't shoot to hit the sheriff, I shot off to one side, to the right, to the east of him.   *   *   *   At that time I was right in front of the car; then I shot the second time.   He was still beating him, he didn't stop the first time, and I shot the second time.   I intended to hit him in the legs to keep him from killing David. I thought he was killing David.   After I fired the second shot, they separated; the sheriff let loose of David at that time and David run down the alley. *   *   *   I didn't know he was the sheriff then.   I just suspicioned that he was an officer.   *   *   *   No, I didn't take the gun out and press it towards him. I don't remember whether I had my hand upon the trigger.   I don't know whether he had hold of me or not; he had hold of the gun.   I don't know whether David grabbed hold of him.   I couldn't see David; he was up behind the sheriff; I don't know where. Henkel and I went out of the car together.   The gun went off.

"*Q.* It was held right against Henkel wasn't it?

"*A.* He jerked it against him.

"*Q.* You remember that do you?

"*A.* Well, he grabbed the gun and it went off.

"*Q.* You remember he jerked it against him and you were trying to hold the gun and prevent him from taking it from you weren't you?

239—Mich.—9.

"*A*. No. I don't know why I didn't let go of it; I was excited; I don't remember."

Later in the night, as he was passing a swamp, Edgar threw the gun away, and testified:

"It came to my mind I had been using the gun and that I had better throw it away."

At the trial, Irving E. Forst, deputy sheriff, a witness in behalf of the people, on cross-examination, was asked about a conversation he had with the sheriff after the shooting and not in the presence of defendants:

"*Q*. And at that time, that is, after that happened there, this gun was exploded, and a shot was fired?
"*A*. He said he had hold of the gun.
"*Q*. That he had hold of the gun when it went off?
"*A*. No.
"*Q*. But that he had hold of it?
"*A*. Yes, sir; Mr. Henkel told me that."

Immediately, on redirect, the witness was asked:

"What else did he say?" and answered:
"He said if it hadn't been for David Arnett pulling him out of the car he would have got it away from him and there would not have been any shooting.
"*Mr. Penny:* I object to that as a conclusion. Mr. Henkel could not testify to that himself were he here."

The court held it admissible as a part of the conversation inquired into on cross-examination. Thereupon the witness testified:

"I believe that is about all he said—if it hadn't been he was pulled out of the car, he had the gun pretty near away from Edgar before he shot. *   *   *
"*Q*. Did he say David Arnett took hold of him around the neck and pulled him out?
"*A*. Yes, sir."

Counsel insist this was reversible error, the statements not having been made in the presence of the accused or as a part of the *res gestæ* or as dying declarations. Right to keep out all such statements rested

with defendants, if not dying declarations. Such right, however, could be and was waived by their calling for a part thereof. Striking out a part of the statement, in the nature of a conclusion, the real sting lay in the statement that David laid hold of the sheriff before the first shot was fired. This was germane to the issues and bore a direct relation to the part of the conversation first inquired into by the defense. There was no error in the ruling on the objection as made. The defense having brought out a part of the statements there was no error in admitting the rest, but no part of the statements constituted substantive evidence unless within the rule of dying declarations. While the grounds for the objection, as stated, were without merit, and the true reason for admissibility of the statements as substantive evidence appears not to have been considered at the trial, the point is now made, in behalf of defendants, that the statements were not admissible as dying declarations. This evidence appears to have been necessary in order to prove the charge against David. If the statements were admissible as dying declarations, we may not reverse because not so denominated at the trial.

Counsel for defendants contend the evidence falls short of laying the foundation for admissibility of the statements as dying declarations. All authorities hold that the declarations must be sanctioned by belief on the part of the declarant that he is about to die; otherwise they are but hearsay. The rule admitting dying declarations is one of necessity and prevails only in case they are sensed by the declarant as *dying statements*. When Mr. Henkel made the statements was he conscious of impending death? · Some wounds certify death. Such a wound was given the sheriff. He was not asked if he was aware of impending death or informed that his death was imminent, nor did he express himself on the subject, so far as this record

discloses. When the first bullet ripped its course through his vitals his hours were numbered. His stoical bearing, restraint of emotions and retention of opinion or knowledge on the subject of dissolution do not at all rule the admissibility of his statements. *People* v. *Simpson,* 48 Mich. 474. To say he did not sense impending death would accord him less than ordinary intelligence.

In *Commonwealth* v. *Puntario,* 271 Pa. 501 (115 Atl. 831), the court stated:

"It may be, and the court so found here, that the nature of the wound is such in itself as to justify the conclusion that the deceased was aware of his impending death. Though no case has been called to our attention in this State where some additional circumstances, indicating the mental attitude of the deceased, did not appear, yet the question has been a matter of consideration by text writers, and in other jurisdictions."

The court then quoted, with approval, from 1 R. C. L. p. 546, and the following from 2 Wigmore on Evidence, p. 1807:

" 'In ascertaining this consciousness of approaching death, recourse should naturally be had to all the attending circumstances. It has been contended that only the statements of the declarant could be considered for this purpose; or, less broadly, that the nature of the injury alone could not be sufficient, *i.e.,* in effect, that the declarant must show in some way by conduct or language that he knew he was going to die. This, however, is without good reason. We may avail ourselves of any means of inferring the existence of any such knowledge; and if, in a given case, the nature of the wound is such that declarant must have realized his situation, our object is sufficiently attained. Such is the settled judicial attitude.' "

While admitted under a right ruling, considering the objection made, and evidently employed as substantive evidence, such use did not constitute reversible

error; being substantive evidence under the rule of dying declarations. We think there was sufficient evidence to submit to the jury the charge against David Arnett.

Counsel for defendants ask this question:

"Did David Arnett have the right, if it appeared to him that his brother was in imminent danger of death or great bodily harm, to act in his defense as against the sheriff, in accordance with such apparent circumstances?"

The question is moot; made so by the verdict of the jury that David seized hold of the sheriff before the first shot was fired, and not, as he claimed, after fear for his brother's life was occasioned by the first shot. Moot because not applicable to the defense offered or the case of the prosecution. The defense was apprehension for the life of his brother, *occasioned by the first shot,* and action then by him and not before. The court instructed the jury to acquit David if his version was not overcome beyond a reasonable doubt. When the jury found that David was a participant in resisting the sheriff at the time the first shot was fired the verdict of manslaughter essentially followed, because there was no testimony that David, before the first shot was fired, thought his brother was shot by, or in great bodily danger at the hands of the sheriff. Moot, because consideration of the propounded question would require a supposititious case negatived by David's own testimony.

Error is assigned on the following portion of the charge:

"There is no question in this case but that the fatal wound which caused the death of Mr. Henkel was inflicted by the revolver in question while in the hands of the respondent, Edgar Arnett, and when Mr. Henkel was attempting to remove him, the said Edgar Arnett, from the Ford car which he, the said Edgar Arnett,

had entered, and with which, having heard the evidence, you are familiar."

The testimony of Edgar Arnett justified the instruction.

It is contended there was error in the following instruction:

"The claim has been made that if David believed Edgar was in danger of his life or of great bodily harm he had a right to interfere with the sheriff and use force to protect his brother.

"Such is not the law as applied to the circumstances of this case.    You are entirely to disabuse your minds of any such claim of alleged law in your deliberations upon your verdict.    When a sheriff or other peace officer attempts to make an arrest the law does not put him in peril of all the family and of all of the relatives.    If any of them interfere they take their chances."

This portion of the charge appears to have been called forth by arguments to the jury, not appearing in the record, but it also related to the theory of the prosecution that David, before the first shot was fired, seized hold of the sheriff and disabled him from overcoming the resistance being made by Edgar, and enabled Edgar to retain the revolver and shoot the sheriff.    If David took hold of the sheriff before the first shot was fired, in an effort to aid Edgar, whom he knew was under arrest, then David had no defense, for in such case his interference was not prompted by apprehension of bodily injury to his brother, for, according to his own testimony, he was not so moved until after the first shot was fired.    If David had hold of the sheriff at the time the first shot was fired, then he was a volunteer aid in an obstruction to a lawful arrest, and blood relationship, without reasonable apprehension of bodily harm to his brother, was neither an excuse or in any degree a justification.    Edgar Arnett admitted he was in-

toxicated. He was in a public place. It was the duty of the sheriff, upon view of his intoxication, to arrest him without a warrant. The sheriff did arrest him. He resisted, and in so doing he committed a felony. 3 Comp. Laws 1915, § 14994. In the course of such felony a revolver in his hands gave the sheriff a mortal wound. Both defendants were aware that Mr. Henkel was an officer in the performance of his official duty, and it was of no moment that they did not know he was the sheriff. The law exacts duties of peace officers and protects them in the performance thereof by rendering it a felony to resist or obstruct lawful arrest, and constitutes it murder to kill, either intentionally or even per mischance, such officer in resisting or obstructing a lawful arrest. Edgar did not excuse himself at all in claiming that, when the sheriff told him he must come with him, he thought of the revolver in his pocket, and, fearful it would be found on his person, took it in his hand to cast it in the back of the automobile, and, as he pulled the revolver from his pocket, the sheriff seized hold of it and it was discharged. Edgar was clearly guilty of murder in the second degree, as found by the jury.

We find no reversible error. Affirmed.

SHARPE, C. J., and BIRD, SNOW, STEERE, FELLOWS, and McDONALD, JJ., concurred. CLARK, J., did not sit.