*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JEROME RANDY ROGERS,

Defendant-Appellant.

UNPUBLISHED
March 30, 2026
9:33 AM

No. 367414
Saginaw Circuit Court
LC No. 20-047404-FC

Before: KOROBKIN, P.J., and YATES and FEENEY, JJ.

PER CURIAM.

Hortense Williams (Hortense) and her daughter, Teresa Allen, were both killed by gunshots on March 14, 2020, while they were in the kitchen of the house Hortense shared with her husband. Defendant, Jerome Randy Rogers, was convicted by jury verdict in November 2022 of two counts of second-degree murder for killing both of the women, MCL 750.317; four counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b; possession a firearm by a person convicted of a felony (felon-in-possession), MCL 750.224f; and carrying a dangerous weapon with unlawful intent, MCL 750.226. Defendant subsequently was sentenced, as a fourth-offense habitual offender, MCL 769.12, to serve 66 to 100 years in prison for each second-degree murder conviction, two years' imprisonment for each felony-firearm conviction, 76 months to 20 years in prison for the felon-in-possession conviction, and 76 months to 20 years in prison for the conviction of carrying a dangerous weapon with unlawful intent. We affirm.

## I. FACTUAL BACKGROUND

By all accounts, Hortense and Allen were both shot and killed as they were preparing food in the kitchen. The issue at trial was the identity of the shooter. The shootings occurred during a gathering of friends and family members, including Hortense's husband, Curtis Williams (Curtis). At the time of the shootings, Hortense and Allen were in the kitchen. Curtis was in another room. Curtis heard someone come in the back door of the house and go into the kitchen. Next, he heard somebody "mumbling something" to his wife like "give me this" or "give me that." Then he heard gunshots. Hortense and Allen were shot, and they both died from injuries caused by the gunshots.

Two others were shot during the incident but recovered. One of those individuals, Jasper Charleston, saw the shooter but did not recognize him at the time of the incident. Charleston failed to identify defendant in a pretrial photographic lineup, but at trial he identified defendant as the shooter. The other person who was shot, Sandra Poole, never saw the shooter's face. No one else in the home saw the shooter's face, either.

Allen fled the home after being shot in the back, and she was found by a neighbor, Theresa Flores. Allen asked Flores to call 911 and said that she was hurt in her back. Allen was in visible pain and stated that she was having a hard time breathing. She was speaking softly and appeared to have urinated on herself. She faded in and out of consciousness during their discussion. Allen later told the 911 operator and Buena Vista Township Police Officer Anthony Teneyuque that the man who shot her was a Black male in his 50s who went by the nickname "Chicago."

Officer Teneyuque's body camera was recording while he spoke with Allen, and a portion of that recording was played at trial. In the footage, Allen also referred to the shooter as "Rogers" and confirmed that he was the same person as "Chicago." At trial, Officer Teneyuque described Allen's condition at the time that he encountered her:

> *A.* She was laying on the couch slouched, sitting up but slouched. You could hear her kind of winching [sic] in pain. Just her mannerisms, the way she was making noises and things of that nature, you could just tell she was possibly injured.
>
> *Q.* Did you observe any sort of injuries on her?
>
> *A.* Because of the nature of the call, I did inspect her. I was able to see—I didn't see any heavy bleeding, anything of that nature, but I was able to determine that she had injury [sic] to her lower torso belly area on the left side there, didn't have significant bleeding, but I could tell it appeared to be a gunshot wound.
>
> *Q.* Was she having difficulty breathing?
>
> *A.* She was having difficulty breathing because I was trying to somewhat get a statement from her to find out what had occurred to her and try to obtain additional information. Every time I would talk to her, she would say she's in pain or she made comments she's having trouble breathing, having trouble talking.

Curtis had three surveillance cameras installed on the outside of his home at the time of the shooting. At trial, Curtis was shown a surveillance video from March 13, 2020 (the day before the incident), which depicted the back door of his home. A man was visible in that video, and Curtis

identified defendant as that man. Curtis called defendant "Chicago," and he had known defendant for approximately 20 years, but he had no issues with defendant at the time of the shooting.[1]

Surveillance footage from the day of the incident showed the shooter, who appeared similar to the man depicted in the March 13, 2020 video in terms of build and complexion. The man was also wearing light-colored gloves. Curtis was not asked to identify the man in the March 14, 2020 video because his identification testimony had been suppressed before trial. White gloves similar to those worn by the suspect in the video were found in a place where mail addressed to defendant was discovered.

Defendant went to Chicago shortly after the shootings. His text messages indicated that he feared for his life and was attempting to get to Florida. He was arrested in Chicago five days after the shootings, and subsequently interviewed by Saginaw Police Detective Anthony Accardo (the officer-in-charge) and another officer. The prosecution admitted the audio portion of the interview at trial, but only certain portions of the interview were played for the jury based on a stipulation of the parties. During the interview, defendant acknowledged that he went to Chicago, but he insisted that his reason for doing so was to visit relatives. During the portion of the interview played for the jury, the officers posed a question, and he responded, "When I got caught?" However, the jury did not hear the leadup to that question, which included a discussion of an unrelated, pending drug charge against defendant in Saginaw. The jury also did not hear defendant emphatically deny that he committed the shootings. Detective Accardo testified at trial, however, that defendant denied committing the shootings. Further, the prosecutor acknowledged that fact in her closing argument.

The parties disputed the admissibility of Allen's statements made after the shootings under MRE 804(b)(2), the hearsay exception for statements under belief of impending death. Defendant also challenged the admissibility of Curtis's identification of defendant in the surveillance videos, claiming it was impermissibly tainted by police suggestion. The trial court chose to admit Allen's statements under MRE 804(b)(2). Also, after an evidentiary hearing, the court permitted Curtis's identification of defendant as the individual in the March 13, 2020 video. But the court suppressed Curtis's identification testimony regarding defendant as the individual in the March 14, 2020 video because that specific identification was made after a police officer suggested to Curtis that the man in the March 13, 2020 video was the same person who appeared in the March 14, 2020 video. At trial, the court reiterated that the evidence of Allen's statements was admissible.

During the prosecutor's closing argument, she made the following remarks:

> What I want you to focus on are particular statements in the interview that you can all listen to if you choose. When asked about the timeframe of when he got to Chicago, he made a statement to Accardo—he asked a question—"when I got caught" in that interview. Innocent people don't say that in an interview. He didn't say when U.S. [M]arshals found me. He didn't say when I got arrested. He

---

[1] Curtis testified that he had known defendant "for about 20 years off and on from way back." He stated that he and his wife, Hortense, had sold defendant Vicodin for "about . . . two or three months" prior to the shootings. Curtis commented that they had sold defendant "a lot of them."

didn't say when I went to Cook County jail. When I got caught, that was the phrase that he used.

Defense counsel did not object to those remarks or raise the subject during his closing argument. Ultimately, defendant was convicted by the jury on all charges and thereafter sentenced as a fourth-offense habitual offender to lengthy prison terms.

While this appeal was pending, defendant moved in the trial court for a new trial based on ineffective assistance of counsel or alternatively for a *Ginther*[2] hearing, raising the same arguments he now presents on appeal. Defendant claimed that defense counsel should have moved to present the entire police interview under the rule of completeness set forth in MRE 106. Defendant argued that the jury should have heard his denial of guilt for the shootings and should have heard the entire context for his question, "When I got caught?" The trial court reviewed the prosecution's brief in response, heard arguments on the matter, and concluded that defense counsel's decision to stipulate to the admission of only certain portions of the police interview was strategic, considering that the omitted portions of the interview included the discussion of a pending drug-possession charge and did not favorably depict defendant. The court further found that defendant did not show prejudice. Defendant's claim that he fled the state to avoid a low-level drug charge was incredible, and there was overwhelming evidence of defendant's guilt, including the surveillance videos, text messages, Allen's identification of defendant as the shooter by his last name and nickname, and Charleston's identification of defendant as the shooter. With the lower-court record fully developed, we must now address the issues raised by defendant.

## II. LEGAL ANALYSIS

On appeal, defendant presents two issues in his brief by counsel. First, he contends that he received ineffective assistance of counsel at trial. Second, he asserts that the prosecutor committed error in her closing argument. In addition, defendant advances several issues on his own behalf in a Standard 4 brief.[3] We will address all these issues in turn.

## A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant claims that he was denied the right to the effective assistance of counsel and a fair trial when his counsel failed to object to the admission of only selected portions of defendant's police interview. In his Standard 4 brief, defendant adds that the trial court erred by neglecting to properly address both prongs of his ineffective-assistance claim. "A claim of ineffective assistance of counsel 'presents a mixed question of fact and constitutional law.'" *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). We review the trial court's findings of fact for clear error, and we review the legal questions involved de novo. *Id*. Clear error exists when this Court is left with a definite and firm conviction that a mistake was made. *Id*. If the trial court does not conduct

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] "Under Administrative Order No. 2004-6, a 'Standard 4 brief' refers to a pro se brief filed to raise additional claims on appeal against the advice of counsel." *People v Jarrell*, 344 Mich App 464, 487 n 10; 1 NW3d 359 (2022).

a *Ginther* hearing, we review the entire trial record de novo to determine whether trial counsel's representation was ineffective. *People v Rose*, 289 Mich App 499, 524; 808 NW2d 301 (2010).

The United States Constitution and Michigan's 1963 Constitution both guarantee criminal defendants the effective assistance of counsel. *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023). To obtain a new trial based on ineffective assistance of counsel, defendant must show that his attorney's performance "fell below an objective standard of reasonableness . . . ." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Also, defendant must demonstrate that, "but for counsel's deficient performance, there is a reasonable probability that the outcome [of the trial] would have been different." *Id*. A "reasonable probability" means " 'a probability sufficient to undermine confidence in the outcome.' " *Yeager*, 511 Mich at 488. As a general rule, "attorneys are given broad latitude to determine trial strategy, and there is a strong presumption that counsel's performance was born from sound strategy." *Id*. "However, counsel's strategic decisions must be objectively reasonable." *Id*. With these standards in mind, we must consider each requirement for ineffective assistance of counsel, i.e., deficient performance and prejudice. See *id*.

## 1. DEFICIENT PERFORMANCE

Defendant faults his trial counsel for stipulating to permit the jury to hear some, but not all, of the statement that he gave to law-enforcement officers following his arrest in Illinois. Pursuant to MRE 106, which is colloquially called the rule of completeness, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."[4] This Court has stated that the rule of completeness does not apply when the omitted portions of the statement would have been more harmful than helpful to the defendant. *People v Hoffman*, 205 Mich App 1, 15; 518 NW2d 817 (1994).

Defendant argues that his attorney should have asked for the admission of the audio of the entire police interview, specifically the leadup to his statement that he "got caught" and the portion of the interview in which he denied committing the murders. After reviewing the police interview in its entirety, we agree with the trial court's conclusion that defense counsel's decision to stipulate to admit only certain portions of the interview constituted sound trial strategy. The stipulation was designed to minimize the prejudicial effect of defendant's discussion of his pending drug charge. The record indicates that counsel reviewed the recorded statement and strategically compromised with the prosecutor by agreeing to admit only portions of the statement, thereby omitting portions that were the most damaging to defendant. Counsel also successfully moved to suppress the video component of the recording depicting defendant in jail garb. The record reflects that counsel was attentive to the contents of the police interview and how they could affect defendant's case.

During the portion of the interview that the prosecution did not play for the jury, defendant admitted that he had a pending drug charge in Saginaw. His explanation for going to Chicago on

---

[4] The Michigan Rules of Evidence were substantially amended effective January 1, 2024. See 512 Mich lxiii (2023). In this opinion, we rely on the version of MRE 106 that applied at defendant's trial in November 2022, rather than the amended version of MRE 106 found at 512 Mich lxvii.

short notice was partly rambling and incoherent. It was reasonable for defense counsel to conclude that admission of that portion of the interview would be more damaging than helpful to his client, considering that defendant not only acknowledged involvement in other criminal activity, but also provided an incoherent explanation for his behavior that would bear negatively on his credibility. Beyond that, defendant's statements were incredible because he claimed that he was in Chicago to visit relatives, yet he wrote in text messages that he was afraid for his life. Consequently, we agree with the trial court's assessment that it was unlikely that defendant would flee Michigan in fear for his life because of the pending drug charge.[5]

As defendant acknowledges in his brief, he said during the police interview that he was not even aware that he had missed a court date until his arrest, and defendant never admitted to fleeing a criminal charge. It would make no sense, therefore, for defendant to refer to getting "caught" on the drug charge when he contends he was not even aware of missing a court date and was innocent of that crime. Later in the interview, defendant admitted that he knew about the shootings and his name had been mentioned in connection with the crimes. Thus, although the officers did not bring up the shootings until later in the interview, defendant was aware that he was implicated in a much more serious crime than the drug-possession case. Counsel did not render deficient representation by deciding that the omitted portions of defendant's interview would be more harmful than helpful to the defense. See *Hoffman*, 205 Mich App at 15.

The fact that defense counsel engaged in sound trial strategy by stipulating to admit only portions of the interview is especially clear when considering that the prosecutor did not emphasize defendant's question about getting "caught" until her closing argument. Defense counsel was not aware until after the close of evidence that the portion of the interview in which defendant referred to getting "caught" would be highlighted for the jury. Trial counsel's strategy must be evaluated on the basis of the information available to counsel at the time of trial, and not with the benefit of hindsight. *People v Thurmond*, 348 Mich App 715, 740-741; 20 NW3d 311 (2023).

Defendant further insists that his counsel should have moved to admit his statements during the police interview denying guilt. But at trial, the officer-in-charge testified that defendant denied involvement in the shootings. Further, the fact that defendant denied involvement in the shootings was something the prosecutor conceded in her closing argument. Defendant suggests that his own statement would have left a more indelible impression on the jury than the testimony of Detective Accardo did, but defendant admits that he decided not to testify in his own defense at trial. Thus, we conclude that counsel's decision not to seek admission of that portion of the interview did not fall below an objective standard of reasonableness.

Finally, to the extent that defendant suggests the jury should have heard the portion of the police interview in which defendant indicated that " 'quite a few guys' " also went by the nickname " 'Chicago," defendant cannot show either deficient performance or prejudice because that fact was supported by evidence at other points in the trial. Curtis testified that he referred to defendant's brother as "Chicago" as well. Tina Sapata, a retired corrections officer, testified on defendant's

---

[5] In Saginaw Circuit Court Case No. 20-001780-FY, defendant was charged with possession of less than 25 grams of cocaine and faced up to four years in prison. MCL 333.7403(2)(a)(*v*).

behalf that "Chicago" was a common street name. In fact, Sapata knew of about ten individuals with that nickname. Defendant's statement on that issue simply would have been cumulative. For these reasons, the trial court did not err or fail to engage in the proper analysis of the ineffective-assistance claim when it determined that counsel's performance was not deficient.

## 2. PREJUDICE

Leaving aside the issue of deficient performance, defendant cannot show that a reasonable probability exists that, but for his attorney's performance, the outcome of the trial would have been different. Contrary to defendant's claim in his Standard 4 brief, the trial court analyzed prejudice thoroughly in its opinion and order, and it correctly reached the conclusion that the jury's verdicts were the results of the overwhelming evidence, as opposed to defense counsel's representation.

Defendant's reference in the police interview to being "caught" may have had an effect on the jury, considering that the jury asked to listen to that portion of the police interview during its deliberations. But that lone comment's impact must be examined in the context of the entire trial, in which the prosecution presented overwhelming evidence of defendant's guilt. At trial, the issue in dispute was the shooter's identity, which is an element of every crime. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). On the issue of the shooter's identity, Charleston (who was an eyewitness and a shooting victim) stated at trial that defendant was the shooter. Allen described the shooter as a Black male in his 50s, which matched defendant's characteristics. Allen also said before she died that the man who shot her was named "Chicago" (which is defendant's nickname) and confirmed that the man's name was Rogers. As we will explain later in this opinion, testimony about what Allen said was admissible under the hearsay exception for statements made under the declarant's belief of impending death. Beyond that, video surveillance footage from the day before the shootings, i.e., March 13, 2020, depicted a man who matched defendant's characteristics, and whom Curtis identified as defendant. Further, surveillance footage from the day of the shootings, i.e., March 14, 2020, depicted a man leaving the home at around the time of the shootings, and that man was similar in complexion and build to the man in the March 13, 2020 video. Finally, white gloves that resembled those depicted on the surveillance footage were found at a place where there was mail addressed to defendant.

Defendant's own text messages indicated that defendant left the Saginaw area for Chicago shortly after the shootings, and defendant wrote that "my life is [in] jeopardy right now." He stated that he was trying to get money to go to Florida. Defendant denies in his brief that his decision to leave Michigan had anything to do with the pending drug charge. During the admitted portion of the police interview, defendant suggested he was simply going to Chicago to visit relatives. That explanation conflicts with frantic statements that he made in text messages about fearing for his life and needing to get to Florida. The jury was well-informed about the limitations in the evidence presented at trial, and the jury was able to determine the appropriate weight to give it. See *People v McGhee*, 268 Mich App 600, 624; 709 NW2d 595 (2005). Considering the evidence as a whole, particularly the in-court identification of defendant and Allen's identification of the man who shot her as "Chicago" and Rogers, the jury had overwhelming evidence to convict defendant. For those reasons, defendant cannot establish prejudice, so the trial court did not err by denying defendant's motion for a new trial or a *Ginther* hearing on the basis of ineffective assistance of counsel.

## B. PROSECUTORIAL MISCONDUCT

Defendant contends that the prosecutor improperly misled the jury during closing argument about what defendant meant when he asked "when I got caught?" during his police interview. In his Standard 4 brief, defendant adds that the trial court erred by failing to address the merits of his claim in its opinion. "In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Defendant did not offer a contemporaneous objection or request a curative instruction. Thus, the issue is unpreserved. See *id*. Unpreserved issues of prosecutorial misconduct are reviewed for plain error affecting substantial rights. *Id*. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). The third prong requires a showing of prejudice, i.e., that the error affected the outcome in the trial court, *id*., so "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (quotation marks and citation omitted, alteration in original).

Prosecutorial misconduct[6] is considered on a case-by-case basis, and this Court is obligated to consider the prosecutor's statements in context. *Bennett*, 290 Mich App at 475. This Court has held that, because "a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). The prosecutor generally has great latitude in making arguments. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). To be sure, prosecutors must conform to the law and the applicable court rules. *People v Evans*, 335 Mich App 76, 89; 966 NW2d 402 (2020). But the prosecutor is entitled to argue the evidence and reasonable inferences arising from the evidence in support of the prosecution's theory of the case. *Bahoda*, 448 Mich at 282.

As an initial matter, we note that defendant's argument in his Standard 4 brief that the trial court should have addressed this issue lacks merit because his motion for a new trial was confined to the issue of ineffective assistance. Hence, examining the issue only for plain error, we conclude that the prosecutor's interpretation of defendant's question "when I got caught?" was reasonable. During his police interview, defendant stated that he was innocent of the drug-related offense and explained that his trip to Chicago had nothing to do with any criminal charges. Yet he then referred to getting "caught," revealing that he had a guilty conscience. See *People v Unger*, 278 Mich App 210, 227; 749 NW2d 272 (2008) ("A jury may infer consciousness of guilt from evidence of lying or deception."). The prosecutor reasonably inferred that defendant's reference to getting "caught"

---

[6] This Court has recognized a distinction between claims of technical or inadvertent prosecutorial error and claims of prosecutorial misconduct, which would warrant professional discipline. *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). Here, defendant presents the issue as one of true prosecutorial misconduct, so we must analyze it as such.

concerned the murders, especially considering defendant's conflicting story about the drug charge, the fact that defendant wrote in text messages that he needed to flee to Florida, and the fact that defendant admitted in the police interview that he was aware of the shootings before the interview and he knew that his name had been mentioned in connection with the shootings. See *id*. at 226 (explaining that evidence of flight is admissible as evidence to support a consciousness of guilt). In other words, the crime defendant meant when he indicated that he got "caught" was a matter of reasonable interpretation, and so the prosecutor's interpretation of that comment during her closing argument did not amount to misconduct.[7]

Even if we assume for the sake of argument that prosecutorial misconduct rose to the level of plain error at defendant's trial, defendant is not entitled to a new trial because the plain error did not affect defendant's substantial rights. See *Carines*, 460 Mich at 763. The trial court instructed the jury that the statements and arguments made by the lawyers are not evidence. The court further instructed the jury about how to consider out-of-court statements by defendant, and the court gave the jury instructions on identification. As this Court has consistently held, "[c]urative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, . . . and jurors are presumed to follow their instructions[.]" *Unger*, 278 Mich App at 235.

The jury asked to listen to the relevant segment of the police interview during deliberations, but we cannot find from the record that the prosecutor's statement affected the jury's deliberations, particularly when the jury presumably followed the court's instructions.[8] Beyond that, as we have fully explained, overwhelming evidence supports the jury's verdict convicting defendant of being the shooter. The evidence against defendant includes a direct identification by an eyewitness and

---

[7] The dissent opens with the statement that "[w]hen the prosecutor urged the jury to 'focus' on the fact that defendant said, 'when I got caught?' during his police interrogation, the jury had no idea that, in context, defendant was likely referring to being 'caught' in connection with a completely unrelated drug charge." None of us on this panel can know whether defendant was referring to the shootings or the unrelated drug charge when he asked: "when I got caught?" The dissent posits that the question referred to the unrelated drug charge, as opposed to the shootings. But a wealth of evidence suggests that defendant was referring to the shootings, rather than the unrelated drug charge, when he asked: "when I got caught?" Defendant conceded that he knew of the shootings before the police interview, and he understood that his name had come up in connection with the shootings. Defendant's text messages stated "my life is [in] jeopardy right now" and he recognized that the United States Marshals Service fugitive task force arrested him. All that evidence reflects that defendant was concerned about being caught for something much more serious than a minor drug charge, so the prosecutor was entitled to ask the jury to draw such an inference.

[8] The dissent does not mention the jury instruction that the statements and arguments made by the attorneys were not evidence. Instead, the dissent places overwhelming weight on the jury's request to hear defendant pose the question "when I got caught?" and the subsequent timing of the jury's verdict. Divining the collective thinking of the jury from its questions and its decision to return a verdict shortly after posing questions is a risky, potentially misleading approach. Perhaps a single holdout juror needed to hear what the other 11 jurors deemed an unmistakable acknowledgement of guilt. Perhaps the jurors had a disagreement about the inflection in defendant's voice. Each of those explanations is just as plausible as the dissent's view of what the jury thought.

an identification through a nickname and a last name by one of the victims. In sum, defendant has not offered any support for a claim of actual innocence, nor has he identified an error that seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *Carines*, 460 Mich at 763. Accordingly, reversal is not warranted on the basis of prosecutorial misconduct.

## C. UNDULY SUGGESTIVE IDENTIFICATION

In his Standard 4 brief, defendant argues that the trial court erred by admitting identification evidence in the form of Curtis's identification of defendant, presumably referring to the testimony that defendant was the person depicted in the March 13, 2020 surveillance video. We review the trial court's factual findings made during a suppression hearing for clear error, and we review the application of law to the facts de novo. *People v Sammons*, 505 Mich 31, 41; 949 NW2d 36 (2020). We review de novo whether an issue raised on appeal is moot. *In re Tchakarova*, 328 Mich App 172, 178; 936 NW2d 863 (2019).

Defendant's argument is difficult to decipher. If he contends that Curtis's identification of him on the March 14, 2020 video should have been suppressed, that issue is moot because the trial court granted that relief before trial, and the parties honored the court's ruling during the trial. See *People v Richmond*, 486 Mich 29, 34-35; 782 NW2d 187 (2010), reh gtd in part on other grounds 486 Mich 1041 (2010). If he claims the trial court's suppression ruling should have extended to the March 13, 2020 surveillance footage as well as the March 14, 2020 video, we hold that Curtis's identification was not obtained by unduly suggestive means. Due process protects defendants from " ' the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures.' " *Sammons*, 505 Mich at 41 (citation omitted). To establish that the procedure was unduly suggestive, the defendant must demonstrate "(1) the identification procedure was suggestive, (2) the suggestive nature of the procedure was unnecessary, and (3) the identification was unreliable." *Id*. Even if the pretrial procedure was improperly suggestive, "in-court identification by the same witness still may be allowed if an independent basis for in-court identification can be established that is untainted by the suggestive pretrial procedure." *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.), overruled in part on other grounds by *People v Hickman*, 470 Mich 602, 603-604; 684 NW2d 267 (2004). The issue of whether an "independent basis" exists is a factual question decided in light of the totality of the circumstances. *People v Gray*, 457 Mich 107, 115-116; 577 NW2d 92 (1998).

Curtis's identification of the person in the March 13, 2020 video as "Chicago" came *before* a police officer suggested that the same person was depicted in the March 14, 2020 video. Curtis did not appear at the evidentiary hearing on the suppression issue, but he testified at the preliminary examination. There, Curtis stated that the detective who interviewed him suggested that the person depicted in both videos was the same person, but not that either person was defendant. His version of events was corroborated by testimony at the evidentiary hearing. Because there was no evidence that the procedure used to obtain the identification of defendant in the March 13, 2020 surveillance video was suggestive, or that Curtis's identification was otherwise unreliable, the trial court could not suppress the identification at trial. Therefore, to the extent that defendant has raised that issue in his Standard 4 brief, the trial court did not err by allowing the identification testimony at trial.

D. ADMISSION OF STATEMENT MADE UNDER BELIEF OF IMPENDING DEATH

Defendant argues in his Standard 4 brief that the trial court erred when it admitted Allen's statements made on the night of the shootings pursuant to the hearsay exception in MRE 804(b)(2) for statements made under the belief of impending death, colloquially known as dying declarations. We review a trial court's decision to admit evidence for an abuse of discretion. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). A trial court commits an abuse of discretion when its decision falls outside the range of reasonable and principled outcomes. *People v Grant*, 329 Mich App 626, 634; 944 NW2d 172 (2019). Significantly, a trial court "necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law." *Denson*, 500 Mich at 396.

Although out-of-court statements offered to prove the truth of the matter asserted generally are inadmissible hearsay, MRE 804 provides exceptions to the hearsay rule in circumstances when a declarant is unavailable to testify at trial. See MRE 804(a)(4). At the time of defendant's trial, MRE 804 stated that, "[i]n a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death" may be admitted at trial. MRE 804(b)(2), as amended May 1, 1995, 448 Mich cxxvi (1996).[9] The trial court must conduct a preliminary inquiry concerning the facts and circumstances surrounding the statement in question to decide whether the declarant was under the belief of impending death when the declarant made the statement. *People v Stamper*, 480 Mich 1, 4; 742 NW2d 607 (2007).

Without question, Allen was unavailable as a witness according to MRE 804(a) because of her death after the shootings. The prosecution of defendant involved homicide, so MRE 804(b)(2) applied to this case. In addition, there is no dispute that Allen's statement that "Chicago" or Rogers was the shooter related to the cause or circumstances of Allen's impending death. As a result, the central issue is whether Allen's statements in question were made under belief of impending death, i.e., whether the circumstances established that Allen was near the point of death and believed her death was impending. The declarant need not state that she is about to die for the hearsay exception to apply. See *People v Arnett*, 239 Mich 123, 132; 214 NW 231 (1927) ("[The declarant's] stoical bearing, restraint of emotions and retention of opinion or knowledge on the subject of dissolution do not at all rule the admissibility of his statements."). "If the surrounding circumstances clearly establish that the declarant was *in extremis*[10] and believed that his death was impending, the court may admit statements concerning the cause or circumstances of the declarant's impending death as substantive evidence under MRE 804(b)(2)." *Stamper*, 480 Mich at 4. One such circumstance is "the apparent fatal quality of the wound." *People v Schinzel*, 86 Mich App 337, 343; 272 NW2d 648 (1978), rev'd in part on other grounds 406 Mich 888 (1979).

The trial court did not abuse its discretion by deciding that Allen's statements were made under belief of "impending death," as contemplated by the hearsay exception in MRE 804(b)(2). The trial court initially made its ruling before trial, but we can find no material difference between

---

[9] The exception for dying declarations is now prescribed by MRE 804(b)(3).

[10] "*In extremis*" means "[n]ear the point of death; on one's deathbed." *Black's Law Dictionary* (12th ed).

Officer Teneyuque's pretrial and trial testimony about Allen's condition at the time that she made the statements in question. Allen died shortly after she was taken by first responders from Flores's house, and the cause of death was a single gunshot that entered her upper back and exited out of her abdomen. Allen's condition resulting from what turned out to be a fatal wound progressively worsened, and she started having difficulty speaking and breathing during her conversation with Officer Teneyuque.

When Officer Teneyuque arrived on the scene, he saw Allen slouched on a couch. Officer Teneyuque was able to observe that Allen had a gunshot wound in her abdomen and was breathing heavily. He noted that she said she was in pain and having trouble breathing. He explained during trial: "I don't believe I was able to get anything additional because I could obviously see she was having a great deal of difficulty talking and communicating with me." Although there was no sign of significant blood loss, Allen said she had difficulty breathing, she appeared to be in significant pain, and she faded in and out of consciousness from a serious wound to her back and abdomen.

The body camera footage shown at trial revealed that Allen's condition deteriorated while she was speaking with Officer Teneyuque. She started in a sitting position, but she began swaying as if she was going to lose consciousness, causing her to lie down. She indicated at several points that she had difficulty breathing. She was eventually taken away on a stretcher. The body camera footage makes clear that Allen was in significant distress, but she nonetheless went to great lengths to answer Officer Teneyuque's questions. These circumstances support the trial court's ruling that Allen was *in extremis* and believed that her death was impending when she described the shooter and identified him as "Chicago." See *Stamper*, 480 Mich at 4. Accordingly, the trial court did not abuse its discretion by admitting evidence of the statements Allen made after she was shot.

Affirmed.

/s/ Christopher P. Yates
/s/ Kathleen A. Feeney